I wonder if the lawyers who were going to argue the case would step up and identify yourselves for the record. Good morning. Donald Rothschild for the appellants. Mr. Rothschild. And Paul Resett for the Human Rights Commission. Mr. Resett. You each have 15 minutes to address the court. I think you both argued in the appellate court. You may save out from your 15 any portion you wish for a response. Are you familiar with the fact that your oral argument is now instantaneously memorialized on the Supreme Court website? You can access it almost immediately and listen to yourself. I'm not so sure that's a good thing, but feel free to do so. Mr. Rothschild, you may commence. Perhaps it might be helpful, at least for me, to ventilate one particular area, problem area, and as far as I'm concerned, one major reason why this case is, why oral argument may be beneficial. We have a situation of a default on liability and a pro se defendant who evidently never made an objection. So when you're presenting your points, bear in mind that it's pushing against those factors, and to the extent that you're cognizant of it during your argument, it could save a lot of time that would otherwise necessitate questions. Yes, Your Honor. And then I have a question for you, right to start off with. You claim that the emotional distress award is too high. You don't give us any citations to show why. We provide an array, a long list of cases and an analysis of those cases, other sexual harassment cases. At the commission? At the commission, yes. Was that in the appellate decisions? I believe we've cited some appellate decisions. There are many commission decisions where the awards are far less, where the conduct is more egregious. But even that plays into my comment insofar as the defendants never put in a defense against that figure. So again, I don't want to prevent you from developing your argument, but bear in mind that that's the 800-pound gorilla in this case. All right, well, let me address that right off the bat then, because I certainly believe I understand your point. In the practice of law, one party doesn't show up, the plaintiff shows up and does a prove-up and pretty much gets whatever they ask for. That isn't the way it works. Well, that's not true. They don't get whatever they ask for. That's what a prove-up is all about. I think it's unfair to many trial judges who hold prove-ups every day of their careers, where they hold the party to their burden of proof, or to their prima facie case, certainly. I've seen it happen both ways. But in this case, at the Human Rights Commission and the administrative law judges, there are a surprising number, and we referenced those in our brief, of default cases where the judge did not give the plaintiff what they asked for, where they held them to a burden. I understand, but you have to establish an abuse of discretion in not doing it under circumstances where there was no objection or no defense interposed by the party against whom this remedy was given. He may have discretion to do it, but is an abuse of discretion not to? I believe under the facts of this case, there was not a showing. There still has to be a showing, as Your Honor pointed out. Yeah, a prima facie showing. So I think that if you direct your comments to establish what it is that's lacking from satisfying the requirement of making a prima facie showing, it will put us more technically into a more constructive position of following your argument. Well, even just to be precise, to follow up on Justice Gordon, Robert Gordon's question, at page 8 of your yellow brief, you make this statement. However, there are numerous cases in which a complainant's unopposed request for emotional damages was reduced. There's no citation to anything following that sentence. It would have been very helpful to us if you had supported that particular statement. I believe in the brief there is a discussion including that. Well, there's all kinds of discussion, but that particular sentence, which is I think at the heart of your argument with respect to emotional damages, you say there are numerous cases where the unopposed request for emotional damages was reduced, period. To page 8 of your yellow brief, and there's no citation to anything. You don't single out the 40-odd citations to administrative hearings in your index of any of those cases, of any of those administrative cases where the reduction was made without a defense being interposed against it. And also while we're at it, in the future, and I'm not being critical here, it would be very helpful to those of us who are Luddites as myself, and not necessarily computer handy, that when you do cite to administrative cases, to give us a bound volume with those decisions. I will remember to do so. That would be very helpful. He's not really a Luddite. Close, but not too close. So the issue that I want to focus on that we've touched on is whether, and to answer the question, the conduct of Mr. Novak was outrageous, which is a legal standard to award emotional distress damages, and whether there was indeed extraordinary emotional damage. What happened in this case is in May of 2002. When you say outrageous, is it not outrageous that he shows this young lady his penis? Is that not outrageous? In the context of the way it happened that she described, this woman was operating a tavern in the state of Wisconsin. She was planning on moving to Florida. He was sitting at her tavern and said, well, I'm starting up a business. Maybe you can come work for me. The next thing you know, that was May of 2002, in July of 2002, she moves into his residence. And one of the things that she objects to was the fact that he was walking around. I think you should temporize the movement to the residence. She was given a separate quarter at his invitation, a separate suite in the edifice that he occupied, as opposed to moving in and sharing the same living room. I believe it's in the record. It was a 16-square-foot townhouse. It wasn't a townhouse. It had a separate bedroom and bathroom. Which she occupied for two months. Which she occupied for two months. And about one month after she moves in, he starts telling dirty jokes. He walks around in his boxer shorts. Get to the peepholes that were. I'll get to those peepholes. Those peepholes were the most egregious of any of the conduct. And I think the only conduct that could be legitimately described as. And you want to put that outside the jurisdictional period. It's not that I want to put it there, Your Honor. I believe that the law recognizes that a discreet event, a discreet act under the Supreme Court's ruling of continuing conduct, gives the complaining party 180 days within which to institute a claim. I was looking at the Gushiera case and the battle between the Galway line of cases and the Morgan line of cases. And it seems that that distinction of discreet events has to be temporized in light of Gushiera and the Morgan line of cases, which our courts have chosen to follow at least in Title VII situations. And that is, if you're talking about a hostile working environment, it's not whether it's discreet. It's whether it is contributing to the general tenor of the environment, along with other acts following that particular violation. So the fact that it's more outrageous than some of the others does not make it discreet. What makes discreet discreet is detachment. If there is continuity of the same atmosphere, be it the fact that it originates in a greater kind of outrage than what follows through, is not the dividing line, according to my understanding of Gushiera. Well, I believe that that conduct was separate and apart from the other types of things that Ms. Lynn was complaining about, that she went to lunches and dinners and my client drank wine and whiskey. No, she's talking about invasions of her intimacies, of her privacy. Rustling through her materials, being in her office, calling her at odd times, and asking her whether she's with somebody. Now, that's a peephole of a different sort. It's not totally unrelated to what you would consider to be the benchmark event of their relationship. Well, I submit that it was a separate event. It was a distinct event, and that may have been of a different nature. There was nothing else like that. in the record of a continuation of invasive behavior of a sexual nature, insofar as it involved gender-to-gender kinds of relationships. Well, the way we view it is that, yes, right from a month after she moved into the residence, there were dirty jokes and that there were these inquiries and that there were instances where he drank too much and wet his pants. You know, I understand that you're going to focus on that, but I'm bringing you back to other kinds of conduct that doesn't simply involve careless behavior by a bipolar old man, but rather a specific interest shown by the individual defendant in the, basically, what is generally categorized as the sex life of someone of a subordinate of the opposite sex. Again, we do believe that that is distinct and that the conduct was not outrageous but for the peoples. It was distasteful, it was offensive, it was bizarre, but it did not rise to the level of a continuum of sexual harassment that occurred in the same vein as the people incident. And when the people incident arose, she immediately moved out and went back to Wisconsin and contemplated her future and elected to come back and continue her employment with this gentleman. You see, it's not a question here, again, of the exclusive conclusion that has to be reached in this case. We, on review, are either going to look for manifest weight of the evidence on matters that are fully factual, or we're going to look to possibly abuse of discretion in mixed questions of law and fact to determine whether there is a latitude of discretion. The mere fact that you can present an argument going one way doesn't mean, doesn't negate the argument that could go the other way. And I think the hardest for you is to show that the other way isn't there. But if you give us one side of it but you're leaving alone the other, you're not helping us on review because that's up to the judge to decide which way he wants to go. It's within the latitude of his discretion. You have to convince us that there was no alternative that would support the judge in exercising his discretion to award damages. Well, in that vein, Your Honor, the exercise of judgment that was brought to bear at the hearing showed that my client, he showed up at this hearing, he showed up late, he claimed that he went to law school but wasn't practicing right at that time, which certainly implied that he had finished law school, none of which was true. But he wasn't declared an incompetent. And as such, he's simply a pro se party who, as the adage goes, has a fool for a client if he's his own lawyer. That may have been true, in fact. But that doesn't necessarily mean that the trial judge had any alternative here but to treat his self-representation as accountable as it would be if it were otherwise. But he still had an obligation to provide him with a fair and impartial hearing. And instead, what ensued was this questioning the minute he walked up to the witness stand about what his assets were, whether he intended to go bankrupt, whether he had bank accounts, whether he had stock holdings, what was the name of the bank where his assets were  Well, did the trial judge abuse his discretion in permitting questioning that would otherwise be irrelevant in the absence of an objection? You know, it's a very tight line for a trial judge to navigate through, the difference between being proactive when there is no adversarial, effective adversarial system in place. This system is designed for effective adversarial interaction. When that fails, it leaves the judge in a very difficult spot because he can't go out of his way to favor the pro se at the risk of being biased against the other side. So the question is, did this judge overstep the bounds in allowing interrogation as to the assets of the defendant when there was no objection by that defendant and when it had some remote basis of relevance? Well, I don't believe that determining the assets of a party in a damage hearing is of an individual. It wouldn't ordinarily in a compensatory situation. It obviously wouldn't in a punitive situation, which this wasn't. Did you have an opportunity here to cross-examine the employee? Did my client have an opportunity? Well, was there a lawyer there? No, there was not. He showed up at the hearing. He showed up late. He told that he had the... This is the hearing on damages. This is the hearing solely on damages. And he shows up without a lawyer. He shows up late without a lawyer and gets up on the witness stand after being called and is quizzed about his stock ownership, his boats, his pickup truck, his snowmobile, his residence, all these questions. And he's grandiose in that room and telling about he managed... The answer to my question is you didn't have... There was no opportunity to cross-examine him. There was not. You cannot retroactively have him declared incompetent. Moreover, in these kinds of inquiries, you know, these are temptations that adversaries get when one side is weaker than the other. There is a tendency to take advantage of that. And that's a very difficult situation for the trial judge to handle. How does he... What does he do? Caution the one side against the other? It's very difficult. But in any event, how prejudicial is it that he allowed these questions to proceed? Again, you would have to establish that somehow getting this information out there caused the trial judge as the fact finder as well as the judge to be more stringent against him than he would otherwise be. I think you're going to have a difficult time. But I think that a fair reading of the record does show that, particularly when you see other cases where the defaulting party did not show up to the damages hearing, where the behavior described by the complainant is much more severe involving touching, demands for sexual relations, and the like, and the awards are greatly lower. And we did detail the variety of cases, including many from the Human Rights Commission, including Judge Brent, where the reductions in this were made. My client shows up to this hearing and is disbenefited from, I believe, his own behavior on the witness stand where he's grandiose, braggadocio, and the judge allowed this to go on. And I think it was prejudicial to my client in the ultimate final analysis. What would your best argument be that there was a lack of evidence of emotional injury? Lack of evidence of emotional injury, exactly. There was evidence of inconvenience, loss of money, a bad job, a failed venture, broken promises. How about the $730 psychiatric bill? It wasn't a psychiatric bill. It was a reference to some counseling that took place, a very vague reference to counseling that took place. It was not the type of psychiatric care that often is found in severe cases of emotional distress, where a party has medication, where they have difficulties relating to persons of the other gender, that they have all kinds of difficulties. All of her difficulties, as described, were primarily related to her economic consequence of a bad job. And this was a startup company. Well, she talked about anxiety. The only problem with the evidence is that we don't know whether she had anxiety before this occurred. She talked about loss of sleep. We don't know whether there was any loss of sleep before this happened. There is a reference by the judge to a loss of sleep that we could not find in the transcript. She testified to every day being a struggle. She was a parent of three teenagers, so I understand where every day can be a struggle, but it didn't really relate to the conduct of Mr. Novak. And she did learn after the peephole incident from her coworkers that he indeed had special problems and was suffering from manic depressive illness. So she did find that out. She did know about it, and I think she handled it. And then she decided, because this business was doing so poorly, she decided to start her own business. She writes him letters inviting him to do business with her, making no mention of any kind of dysfunction in the workplace or dissatisfaction. She just says that she's moving on and can offer him some of these business services. That does not get a favorable response from him. And then she writes another letter, which is all in the transcript. This is at C-309. She's officially resigning and is going off with this gentleman who was her significant other, and she thinks that Mr. Novak has an excellent program. Again, no mention of any sexual harassment, discomfort, or otherwise. Then, finally, three days later on the 9th, she states her resignation is due to her salary not being paid for several months along with promises and contracts being changed without her permission. And conversations that she had that were emotional and that there were sexual remarks. She adds that in there. Then she waits, not one, not two, but three months to file a case, and then the month after that she goes off on a European vacation with this gentleman. We don't believe that these were the types of severe emotional damages, emotional suffering, that she described when she in the transcript described her reasons for leaving. It's, again, broken promises, disappointment, embarrassment, telling her family and friends what happened to her, that the job didn't work out, that she was the national sales director, but she was the only full-time employee of the company. It turned out to be a bad job. Do you want to sum up, Mr. Rothschild? We need to hear from the Attorney General. Yes. In view of all that, we believe that the award of Judge Brent was excessive. It was not based on comparable awards in other cases, and we believe it should be reversed and remanded. Thank you. Thank you, Counsel. We'll give you an opportunity for a response once we've heard from the Attorney General. I do appreciate that. Mr. Reset. Good morning, Your Honors. The two primary issues that they raise have to do with the back pay damages and the emotional distress damages. What's the obligation of an administrative law judge in an administrative hearing when an unrepresented defendant, who has already waived everything but the flag, shows up without a lawyer, and the other side calls him as an adverse witness? Is there any duty on the part of the administrative law judge to ensure a fair hearing if it becomes apparent in the course of the hearing that the person who is being examined as an adverse witness may not be compass mentis? I think in a case of any obligation at all. Does he just let himself distract? Well, I think whether it's an attorney or a pro se person representing the employer, that the ALJ always has to make sure that the proceeding is conducted in a fair manner. Regarding the question about the mental state of a pro se, or even an attorney who's there representing the client, if the attorney has mental problems, there were no indications other than one reference made in Ms. Lynn's testimony toward the end that Mr. Novak even had a problem. Mr. Novak did not say at the damages hearing, I have bipolar disorder. I'm having trouble processing what's going on. If you read the transcript, his testimony when he's being an adverse witness under Ms. Lynn's counsel is very lucid. There's nothing odd about it. There's no remark by the ALJ that he's acting oddly, walking around the room or hearing voices or anything like that. There's just one little bit of testimony where Ms. Lynn says that on the day when she left the townhome because of the peepholes being discovered, that the other employee of the company said to her that Mr. Novak was manic depressive. So they're suggesting that because she reported this hearsay in her testimony, that the ALJ should have taken that at face value, which was hearsay, which was from not even a doctor, it was from a coworker, and then decided right then and there Mr. Novak was not fit to represent himself and schedule a new hearing just based on that. So there was not enough evidence in the record, you feel, for the ALJ to take any kind of affirmative action to protect Mr. Novak's rights? Well, there was no evidence. And, you know, you can be bipolar and function in society. Of course. So, you know, this affidavit came in way after the evidence came out. But if a man comes into the courtroom speaking in tongues. Right. I mean, for example, if you stood up and began to speak in tongues, Mr. Reset, we'd probably take a recess. Right. But, again, if you look at the transcript, there's nothing inordinate about it. And, in fact, you know, his cross-examination, which he did cross-examine Ms. Lynn, is not the greatest, but pro se people never do a good cross-examination. Cross-examination is an art many attorneys are not good at. So there was nothing. There were no red flags sent to the ALJ that there was any problem with Mr. Novak. Was there any inquiry here by the administrative judge of Mr. Novak, whether he would prefer to have a lawyer represent him? I don't believe so, Your Honor. He wasn't cautioned or anything like that? Generally, that kind of caution is not considered excessively proactive. Correct. I mean, I think Mr. Novak knew that attorneys would be helpful because he did have attorneys at the beginning of the proceeding in front of the Department of Human Rights. In fact, at the fact-finding conference, which he was defaulted to not attending, the attorney showed up, but he didn't show up. But then later the attorney withdrew. Is that correct? Excuse me? The attorney later withdrew. That attorney then withdrew, but then after the damages hearing, he retained a different law firm to file the exceptions. So he defaulted on liability. He shows up at the damages hearing pro se. He does not put on any evidence at the damages hearing. He does not file a pre-hearing memo or a post-hearing brief. He does nothing until there's a recommendation of a $200,000 award, and then suddenly then he lawyers up, and then they want to fight and pick every little point. Let's shift gears for a moment. Supposing instead of awarding $100,000 for emotional distress, the administrative law judge would award $5 million for emotional distress. No objection. Is that the end? No, that would not be acceptable. Would that be reversible without an objection being interposed? I think it would be. So now if there are numerous contemporaneous decisions by the same ALJ for similar or even more serious sounding violations by the defendant that involve less than half the amount awarded by this administrative law judge, would that be reviewable for abuse of discretion? Yes. His decision making is always reviewable for abuse of discretion. But we notice that in your brief you don't spend any time virtually defending the propriety or the appropriateness of the amount other than to say that it was not opposed. Actually, I beg to differ. Perhaps I did not explicitly say that. Well, I look very long and hard at your brief. No, I talk about the evidence, and I talk about the liability, which is all defaulted on. And as an initial matter, just because something is unopposed doesn't mean that the complainant is going to get the full amount they request. But that's the only defense that your brief interposes to the charge that the amount was excessive. I don't believe that's so, Your Honor. We talk about the evidence. We talk about all the mental anguish that she went through. Well, wait a minute. When you talk about the evidence, where is there evidence of an emotional injury here? She says I have a lot of trust issues. I had a lot of counseling. I had some loss of sleep. And I had some anxiety. There's no evidence that she didn't have this before. There's no evidence that she didn't have something else in her life that could have caused that. You know, when you don't have an expert witness on emotional injuries, the evidence has to be clear enough for a court or a hearing officer to be sure that we have an actual emotional injury caused by the acts that are complained of. That's right, Your Honor. As I was saying before, just because a damages amount award is uncontested doesn't mean that the ALJ gives the full amount to the complainant. My question to you is where in the record? I not only read the record. I have it typed out in front of me. I've looked at it 20 or 30 times already. I'm trying to find where is the emotional injury. I mean, I do think when it's a contested issue that the ALJ looks at it more closely. However, it's always the complainant's burden to show that she suffered the damages. And I think that we do discuss in our brief, she talks about her feelings during, while she was working for the company, during the two months that she was living in the townhome, and during the time when she had her own apartment and the harassment continued. And then she also talks about the effects that she suffered since her constructive discharge from this company. Regarding the period when she was working there, she talks about how anxious and worried she was by the fact that he was commenting on her large breasts and her body parts, discussing her body in front of third parties. Well, when she say anxious, what does she mean by that? Well, the question is how did this behavior make you feel? And she says it caused anxiety, it caused nervousness. She said that when she came back from visiting her children and found that he had gone through her underwear drawer, that she felt like her privacy had been invaded and she felt violated. She talked about how when she came back and discovered that he had drilled the peepholes into her bathroom and her bedroom, clearly intending to spy on her when she was undressed and using the restroom, that she felt devastated. She immediately called a co-worker and said, help me get out of here and get me into a hotel room. So she talked about all those feelings that she, him calling her at midnight and 5.30 a.m. asking, are you having sex now? Who are you having sex with? She talked about all those feelings that happened during the time she was working, I mean living in the townhome. But how long did those feelings last? We don't know. Well, she also talked about how in the two years between when she was constructively discharged and the hearing, that she continued to suffer, that she had gone to 13 counseling sessions with two different psychologists. And do we have medical bills and evidence to substantiate that? We do. And ALJ awarded her that amount to pay for those bills, and they have not appealed that award and contested that she, in fact, did seek the psychological counseling from two different people. So there is evidence in the record. And sure, there could have been more, but they could have cross-examined her. If they thought her testimony was vague or not sufficient, they could have said they could have cross-examined her on it, and they chose not to. So they created this situation where the record is not fully developed by not cooperating with these proceedings, and now they want to have a restart and go through everything again, when this case has already been pending for so many years. In your research, did you explore the range of emotional distress awards by this commission? Yes, I did, Your Honor. Is the fact that we don't see any of those, the results of your research, mean that you weren't particularly successful except in two rape cases to show that awards ever reach the six-figure level? Well, I think I'll admit that this is at the high end of the awards that have been awarded in the past, but I think we have to start with the fact that this court in ISS first told the commission that it should not be stingy or conservative in granting emotional distress awards. So it's advised the commission to be liberal in awarding these damages. Second, I did cite a case that talks about how it's hard to compare these sorts of cases because the facts and circumstances are different in every case, and I could not find any cases that involved these sort of extreme violations of privacy, including pee-poles into bedrooms and bathrooms. Whether you characterize that as an extreme violation depends on what you make of the factor that these happened while the plaintiff was living virtually in the same domicile as the defendant. It might have been more extreme if it was done on the job site. It's another thing when it's done under this guy's roof. But, see, I think it cuts you the other way, Your Honor, because I think in your home situation you have an expectation of privacy that's greater than in the workplace. There's even some question that was raised in my mind, and I don't have a real problem with it, whether the events that took place in the defendant's place of residence can really be attributed to the hostile environment at the workplace or whether that is completely private. I'm reconciled to the notion that it can be. But its relationship is tangential. And it's also important to note that during those two months when she lived there, the office for the business was also in the town home. So this was a 24-7 intertwining of work and home life. It was in the basement at that time. Correct, correct. Obviously, she chose to establish her residence at that spot. Obviously, changes the nature of the outrage. I mean, I think that would be interesting to explore on a liability issue. But because they defaulted on liability, you know, if they had gone to a hearing on liability, they could have denied that he did some of these things. They could have tried to put them in context or explain them. But because they didn't, we deem the allegations as charges. They could have tried to impeach her testimony on a whole variety of things. Correct. They did none of those things. So that's really not an issue before us. And I understand that some women would have declined this invitation. The only issue before us is the appropriateness of the damage award. That's correct. And the only issues that they're really focusing on are the back pay, which we think that she did sufficiently prove up. She showed what she was making while she was there. Doesn't she have a duty to mitigate? She has one, but failure to mitigate is an affirmative defense, and they never raise that affirmative defense. So you argue that that's been waived. Right, and they don't even respond to that argument in their reply brief. Well, they didn't file, you know, anything. They were in default, so if they're in default, there still might be an obligation to show some mitigation. They weren't in default on the damages issue, though, so they could have raised it prior to the damages hearing. This Court has held that you can't even wait until the post-hearing brief to raise it. Also, under the federal case in Smith, starting your own business is not inconsistent with mitigation. Correct, and that was their main question. There is a good faith effort, and that was never tested. Right, they could have explored that on cross-examination, but they chose not to. So, again, they created this situation. It's really unfair to the complainant. They created this situation where the record isn't fully developed, and then they want a reversal because of the absence of evidence that they caught. If we're troubled or have some anxiety about the size of the emotional distress award, what should an appellate court do to express its anxiety? We have to write an order or an opinion in this case, and how do we express that anxiety without, in effect, sending it back and saying, take another look at it. I mean, you could caution the commission that you would like them to be more careful. Something auditory we could inform with a caution? Correct, but then we reduce on our own volition, or would that necessitate a remand? I think you would have to remand your honor. We could do it on our own? Well, the argument would be that the evidence is how could you decide what valid value to assign to what she suffered. Very good question. Well, we have a lot of years up here. Right. But the commission has special expertise in sexual harassment cases. And you know, the commission, with all due deference, which they're entitled to, also can assert the kind of obstinacy on a remand without a mandate, and has done so in the past. I'm sorry to hear that, but I hope it was under a previous administration. So, in any event, your honors, as I say, it is towards the higher end of the spectrum. Definitely handled, Mr. Rizzo. But, you know, part of it might be that perhaps some of the awards in the past were too small when you consider the amount of suffering that some of these victims have gone through, plus the time value of money. You can't really compare an award from 1992 to an award today because $100,000 doesn't go as far as it used to. So, for all those reasons, unless this court has further questions, we would ask you to affirm. Thank you, Mr. Rizzo. Your brief was very helpful. Thank you. Mr. Goldstein, a final word? Just briefly, your honors. Very interesting point. What if they awarded $5 million? Would that have to stand? Well, that would be very excessive. We think that the $100,000 award is excessive when weighed against the other cases. We're about 40 years past the economic era where $100,000 is shocking. When I started in practice in the 60s, the first million dollar jury award came into being. Now that hardly pays costs. And the initial cases that awarded emotional distress damages at the commission level were in the $5,000 and $10,000 range. And they have inflated. But there's very few that are over $50,000. And Judge Brent himself, in default proceedings, looked at the circumstances and reduced the award because he held that they exceeded the norm of what the commission typically awards. And we submit that a review of the commission cases will illustrate that the norm of emotional distress damages was exceeded, that this is far and away above. This is consistent with the rape case. This is consistent with a case of a young lady who was on work release, and she was demanded to have sexual relations. But with the return to jail. Yeah. It just isn't of that nature, what happened to Ms. But speaking of that, is there something analogous about that? Maybe that there's a place where her economic loss and her sexual disturbance coalesce. Just as in the rape case, the return to jail alternative was a factor to be considered in establishing the impact of the sexual intrusion. Here, she abandoned her own business to come to work for this fellow, and found in him a very disturbing environment that he presented for her, including misusing her services, having her run errands when she was supposed to be an executive. That also intersects with gender disparagement, because asking a woman to buy the donuts is a form of sexual discrimination. And forcing her, under circumstances, to return to her home in Wisconsin with nothing, because she couldn't endure or tolerate the sexual hostility that this environment created for her. Shouldn't that count? With all due respect, Your Honor, I think I understand what you're saying, and I respectfully disagree. I don't think that these features of economic loss... Well, how is that different than the alternative of returning to prison, which supported a $150,000 recovery in the case that you're referring to? Well, because I think that it was a condition that that employer was placing on the complainant, in that case, to have sex. Here, there was... There's economic coercion. To have, to tolerate the sexual kinds of violations. There are economic consequences to many job losses that aren't compensable. People lose their houses. People go bankrupt. People have consequences. No, but her tolerance of the conditions, according to her testimony, and they may or may not be true, but for our purposes, they are since they were not challenged in the default judgment, were attributable to a kind of economic coercion to tolerate the misbehavior. I don't believe that those are compensable elements of emotional distress damages that have ever been recognized by the commission. Furthermore, she was planning on leaving this position in Wisconsin. She was on her way to Florida. And after the significant incident that she didn't take action on within an appropriate time frame, she elected to return and continue on. And she did, in fact, start her own company, and she did have apparently some success with the company. So I don't believe that these ancillary and consequential things that happened to her economic life are the types of emotional distressers that the commission ever has looked at in determining whether or not there should be an award of emotional distress damages. And, in fact, the types of things that they look at, such as medications, effect on functioning in life and relationships and going out, and those kinds of things are simply not present here. And we contend that the award is grossly excessive and that the court can properly look to the other awards of the commission in making its decision on whether or not to affirm here. And we urge you to reverse. Thank you. Counsel, thank you both. The case will be taken under advisement. We're going to take a short break.